**Affirmed and Memorandum Opinion filed March 21, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00148-CR

---

**ROGERS HENRY WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 208th District Court
Harris County, Texas
Trial Court Cause No. 1247169**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Rogers Henry Williams of aggravated assault and assessed his punishment at 70 years' imprisonment and a $10,000 fine. On appeal, Williams argues: (1) the trial court erred by denying his request for an additional peremptory strike; (2) the evidence was insufficient to support the conviction; (3) the trial court erred by denying his motion for mistrial during the punishment phase; and (4) the trial court erred by overruling his objection to the introduction of

an extraneous capital murder during the punishment phase. We affirm.

I

In June of 2006, Williams[1] was in non-exclusive relationships with both complainant Frankalakena "Frankie" Robertson[2] and Michelle Grant. He shared an apartment with each of them, on Telephone Road and Southlawn Street, respectively. On the evening of June 29, Robertson was at her apartment with her cousin Jamita Hemphill and Jasmine Heard. While there, Hemphill and Heard argued and fought over Larry "Big Boy" Shields. Williams was also at the apartment that night, but he left around 1:00 a.m. to go to work at an after-hours club. Shortly thereafter, Robertson, Hemphill, and Heard also left the apartment. Hemphill and Heard wanted to confront Shields about their argument, so Robertson drove them to the corner of Napoleon and Dennis Streets, where Shields could usually be found. Robertson testified that she called Williams from the car and told him she was ending their relationship, and that Williams replied he was going to kill her.

Robertson, Hemphill, and Heard arrived around 1:30 a.m. and saw Shields standing outside. Robertson parked on Napoleon Street and waited in the car while Hemphill got out to talk to Shields. After several minutes, a car drove down Napoleon Street toward the group. The car stopped and its male driver emerged and approached Robertson, holding a gun. Robertson and Hemphill both recognized the man as Williams. Frightened, Robertson sped away as the man shot four to six bullets at the back of her car. Heard, who was sitting in the backseat behind Robertson, was shot in the upper thigh.

A jury convicted Williams of aggravated assault against Robertson and

[1] Williams is also known by the nicknames "Tink" and "Tinkerman."

[2] Robertson is also known by the surname "Vaughn-Murphy."

2

assessed his punishment at 70 years' imprisonment and a $10,000 fine. In four issues, Williams appeals.

## II

In his first issue, Williams argues the trial court erred by denying his request for an additional peremptory strike after venireman number seven, Mr. Riley, "was excluded on [an] improper commitment question on motion by the State." We understand Williams's challenge to include three subparts: (1) the prosecutor asked an improper commitment question, (2) the trial court erred by granting the State's motion to challenge Riley for cause, and (3) the trial court erred by denying Williams the additional peremptory strike he requested as a result of Riley's dismissal. We address each of these issues in turn.

## A

First, Williams contends the prosecutor asked an improper commitment question while inquiring about each venireman's willingness to convict a defendant based on the testimony of only one eyewitness.

To preserve error for appellate review, the complainant must make a timely, specific objection and obtain a ruling from the trial court, and the point of error on appeal must correspond to that objection. Tex. R. App. P. 33.1; *Dixon v. State*, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998). To be timely, the objection must be made at the earliest possible opportunity. *Dixon*, 2 S.W.3d at 265. It is also necessary that the objecting party continue to object each time the objectionable question or evidence is offered, obtain a running objection, or request a hearing outside the jury's presence in order to preserve the complaint for appellate review. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999). When, in response to an objection,

the State rephrases the question and no objection is made to the rephrased question, there is no adverse ruling to complain of on appeal. *Grant v. State*, 345 S.W.3d 509, 512–13 (Tex. App.—Waco 2011, pet. ref'd); *Badall v. State*, 216 S.W.3d 865, 872 (Tex. App.—Beaumont 2007, pet. ref'd).

In this case, the prosecutor posed the following question to each venireman: "If there's only one witness, but you believe that witness beyond a reasonable doubt that the crime has occurred, will you convict?" The first five veniremen responded affirmatively, but venireman number six replied, "I don't know." The following exchange then took place:

> [PROSECUTOR]: Can't let you get by with that. And it doesn't matter to me one way other [sic] another, but this is the question: If you believe one witness and you believe that one witness beyond a reasonable doubt, can you convict based on that testimony?
>
> VENIREPERSON [6]: I don't know if I can believe one witness.
>
> [PROSECUTOR]: Okay. But in my hypothetical and I have to put this—
>
> [DEFENSE]: Judge, I object to, again, committing him. If one witness creates a reasonable doubt in his mind, then he's not disqualified.
>
> THE COURT: Well, I'll sustain your objection. Just rephrase your question.
>
> [PROSECUTOR]: Okay. If you believe the witness beyond a reasonable doubt, and that part's really important in my question, can you convict?
>
> VENIREPERSON [6]:  I guess, yeah.
>
> [PROSECUTOR]: Okay. Juror No. 7?
>
> VENIREPERSON [7]: No.

The defense did not object to the rephrased question. Therefore, Williams did not preserve this complaint for appeal. *See Grant*, 345 S.W.3d at 512–13; *Badall*, 216

S.W.3d at 872. Accordingly, we overrule this issue.[3]

B

Second, Williams argues the trial court erred by granting the State's motion to challenge Riley after he further elaborated on his reservations about convicting a defendant based on one witness's testimony. Williams maintains that Riley was not objectionable because he merely stated that the testimony of one witness could not get him to the threshold of "beyond a reasonable doubt" and not that he was biased against the law.

To show that the trial court erred by granting a motion to challenge a venireman, an appellant must demonstrate that the trial judge either applied the wrong legal standard in sustaining the challenge or abused her discretion in applying the correct legal standard. *Jones v. State*, 982 S.W.2d 386, 388–89 (Tex. Crim. App. 1998). It is the challenging party's burden to demonstrate that the venireman he seeks to have stricken is, in fact, incapable of, or at least substantially impaired from, following the law. *Castillo v. State*, 913 S.W.2d 529, 354 (Tex. Crim. App. 1995). We give considerable deference to the trial court's ruling because the trial court is in the best position to evaluate the venireman's

---

[3]Although Williams's brief does not make it entirely clear, it suggests that he also takes issue with another question asked during voir dire. Specifically, Williams points to the prosecutor's inquiry about whether the veniremen would feel threatened if they were approached by someone holding a gun or a knife. The prosecutor further asked whether a previous relationship with the armed person would affect the veniremen's opinions. During this line of questioning, Riley responded, "It depends on the circumstances of the situation." The prosecutor then asked:

> And it might go to the specificness [sic] of the threat. If we have a relationship and I did something to you and you came at me with a gun, or a knife, or I felt like you had done something to me and I come at you with a gun or a knife, that might go to the specifics of threat. Right?

Riley responded, "Uh-huh." The defense did not object. Therefore, Williams did not preserve this error and, to the extent he complains of it on appeal, we overrule the issue.

5

demeanor, responses, and sincerity. *Newbury v. State*, 135 S.W.3d 22, 32 (Tex. Crim. App. 2004); *Conklin v State*, 731 S.W.2d 655, 656 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd); *see Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (stating that appellate courts afford "almost total deference" to a trial court's resolution of factual and legal issues that turn on an evaluation of credibility and demeanor). In evaluating the trial court's action, we review all of the venireman's responses during voir dire. *Conklin*, 731 S.W.2d at 656.

A venireman who categorically refuses to render a guilty verdict on the basis of only one eyewitness is not challengeable for cause on that basis so long as his refusal is predicated on his reasonable understanding of what constitutes proof beyond a reasonable doubt. *Castillo*, 913 S.W.2d at 533. Such a venireman may only be indicating that his threshold for proof is somewhat higher than the minimum that the law recognizes as sufficient. *Id.*; *Tran v. State*, 221 S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). As long as the law permits a range of "reasonable doubt," a venireman who says he will hold the State to the high end of the range is not requiring anything the law does not tolerate. *Castillo*, 913 S.W.2d at 533. But if a venireman says he would not convict even if he believed the testimony of the State's only eyewitness, and that testimony convinced him of the defendant's guilt beyond a reasonable doubt, can be challenged for cause because he holds the State to a higher burden than the law allows. *Id.*; *Tran*, 221 S.W.3d at 86.

In this case, the defense asked Riley a number of follow-up questions regarding his views on convicting a defendant based on the testimony of only one witness. Riley explained, "with one witness, it's hard for me to convict a person or be on a jury and convict because people look at things differently. They see things they didn't see. It happens all the time." To clarify, the defense asked, "[W]hat I'm

6

hearing from you, that one witness wouldn't convince you beyond a reasonable doubt?" Riley responded, "No, it has to be 100 percent. I have to see visual, I have to see all of that. I can't just say—because people make mistakes all the time." After the trial judge announced the peremptory challenges, she asked Riley to approach the bench to further discuss the one-witness issue. Riley explained:

> [I]t's hard for me to hear one witness, his testimony and say, Okay, I can believe this, just what one person said. Unless they have— evidence has to be 100 percent sure. I mean, I have to see visual. They have to show me something that says, okay, This person was there at that time and they actually saw what they saw.

To clarify Riley's position, the judge asked, "[I]f there were only one witness, it's not a problem with finding someone guilty based on only one witness. It's that, in order to do that, you would have to believe them beyond all doubt or 100 percent; is that right?" Riley replied, "Yes, ma'am. I have to see it."

The State's burden was to prove Williams's guilt beyond a reasonable doubt, not beyond all doubt. *See Fluellen v. State*, 104 S.W.3d 152, 164 (Tex. App.— Texarkana 2003, no pet.) (finding no error in a jury charge that did not define reasonable doubt—it merely instructed the jury that the State must prove the defendant's guilt beyond a reasonable doubt, not beyond all doubt); *Rogers v. State*, 795 S.W.2d 300, 306 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd) (remarks that State is not required to present proof beyond all doubt or beyond a shadow of a doubt are lawful). Therefore, by requiring proof beyond all doubt, Riley indicated he would hold the State to a higher burden than the law allows and was validly challenged for cause. *See Lee v. State*, 206 S.W.3d 620, 623–26 (Tex. Crim. App. 2006) (concluding that the veniremember was validly challenged for cause because he said even if he heard one eyewitness and believed that witness beyond a reasonable doubt and believed that witness's testimony proved the indictment beyond a reasonable doubt, he would still require additional evidence to

7

return a guilty verdict). Because the trial court did not err by granting the State's motion to challenge Riley for cause, we overrule Williams's first issue.

## III

In his second issue, Williams argues that the evidence at trial was insufficient to support his conviction.

In a legal-sufficiency review,[4] we examine all the evidence in the light most favorable to the verdict to determine whether a rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This standard of review applies to cases involving both direct and circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Uyamadu v. State*, 359 S.W.3d 753, 757 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). We consider all the evidence presented at trial, but we do not substitute our judgment regarding the weight and credibility of the evidence for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Bradley v. State*, 359 S.W.3d 912, 916 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). We presume the jury resolved conflicting inferences in favor of the verdict, and we defer to that determination. *Clayton*, 235 S.W.3d at 778; *Uyamadu*, 359 S.W.3d at 757. We further determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778; *Bradley*, 359 S.W.3d at 912.

---

[4] A majority of the judges on the court of criminal appeals have held that because there was no meaningful distinction between the legal- and factual-sufficiency standards, the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

To obtain a conviction for aggravated assault against Williams in this case, the State must have proved, beyond a reasonable doubt, that Williams intentionally or knowingly threatened Robertson with imminent bodily injury by using or exhibiting a deadly weapon. *See* Tex. Penal Code §§ 22.01(a)(2), 22.02(a)(2). It is well established that threats can be communicated by action or conduct, as well as by words. *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984); *Dobbins v. State*, 228 S.W.3d 761, 766 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd).

In this case, the jury heard the testimony of four eyewitnesses, beginning with Robertson. According to her, she was with Hemphill and Heard in her apartment, which she shared with Williams, on the evening of June 29, 2006. Hemphill and Heard were fighting over Shields when Williams came home, and he helped Robertson break it up. Around 1:00 a.m., Williams left to go to the after-hours club and told Robertson, Hemphill, and Heard not to leave the apartment while he was gone. Robertson saw him drive away in a light blue car that he occasionally borrowed from Grant.

Hemphill and Heard wanted to confront Shields about their argument, so Robertson drove them to his "normal hang-out spot" on the corner of Napoleon and Dennis Streets. She called Williams from the car and told him she was ending their relationship, and Williams replied, "Bitch, when I find you, I'm going to kill you." Around 1:30 a.m., Robertson parked her car facing south on Napoleon Street, where Shields was standing outside. Robertson testified that Hemphill and Heard both got out of the car and resumed yelling and fighting. About fifteen minutes later, Robertson saw a light blue car—which she recognized as the car Williams was driving when he left the apartment—driving southbound down Napoleon Street, approaching her car from behind. The car stopped on the opposite

9

side of the street and its lights went off. Robertson then saw Williams get out of the car holding a gun. She testified that there was no doubt in her mind that it was him and that she was not on drugs at the time. She called out to Hemphill and Heard that Williams was there and for them to get back in the car because she was leaving. Robertson testified she felt nervous that Williams found her and was thinking, "I'm fixing to get up out of here, because I'm not trying to get killed."

Robertson then looked up and saw Williams standing next to her car. He stuck his gun in her open window and shot a bullet through the car, which passed through the open passenger's window. With Heard in the backseat and Hemphill still standing outside, Robertson put her car in drive and sped away. Williams continued shooting at her car, and Robertson believed he was trying to blow up the gas tank. Heard said she had been shot. Robertson's brother, Ricky Houston, lived nearby, so Robertson drove to his house and called 911 from the car. When she got there, she ran inside, leaving Heard in the car. She testified that she was too scared to go outside to help Heard because she did not know whether Williams had followed her. The police arrived at Houston's house five to ten minutes later, and Robertson explained what happened, named Williams as the shooter, and gave the police his picture.

Shields was the second witness to testify at trial. According to him, he was standing on the corner of Napoleon and Dennis Streets selling crack, and Robertson, Hemphill, and Heard got there around "9:30, 10:30. Somewhere around there." Hemphill and Heard both got out of the car and had a physical fight. After about five minutes, Shields saw a car driving southbound down Napoleon Street, approaching Robertson's car from behind. The driver, a man whom Shields had never seen before, jumped out of the moving vehicle and ran toward Robertson's car with a revolver in hand, while his car continued to roll down the street. Shields

10

heard Robertson call out to Hemphill and Heard, "[T]here go Tinkerman . . . Get in the car, bitch." The witnesses consistently testified that Tinkerman was one of Williams's nicknames. When asked to describe how Robertson sounded, Shields said, "[L]ike, something was about to happen. Come on, let's go." Hemphill and Heard both got back in the car, and Robertson drove away quickly. The man began shooting at Robertson's car, and Shields ran to the side of a house across the street. He testified that the man shot five or six times before getting back into his car and driving away.

According to Hemphill's testimony, Robertson did not call Williams from the car after they left the apartment, although she also said that her "mind was somewhere else" while they were driving. Hemphill testified that she was high at the time because she, Robertson, and Heard had taken Xanax. Robertson parked on Napoleon Street facing south, and Hemphill got out of the car. Heard stayed in the backseat behind Robertson and was "cursing [Hemphill] out." About ten minutes later, Hemphill saw a light blue car driving northbound on Napoleon Street toward Robertson's. Hemphill identified Williams as the driver, and Robertson said, "Bitch. Tinkerman, ho'. Get in the car."[5] Williams got out of the moving car, and it continued to roll down the street. Robertson began driving away while Hemphill was still outside, and Williams shot "a good four times" at Robertson's car. Meanwhile, Shields ran across the street and continued running through the next cross street. Williams approached Hemphill, asked her where Robertson went, and hit her on the head with his gun when she did not answer. Williams then "took off." Hemphill did not see where he went because she ran in the opposite direction. She ran until she saw Robertson, Heard, the police, an ambulance, and the media at

_____

[5] Hemphill explained that she and Robertson both had "phone chirps. Nextels" at the time and that Robertson used the "chirps" to tell Hemphill that Williams was there. We believe Hemphill refers to the walkie-talkie feature that certain Nextel cell phones had at one time.

Houston's house, where she stopped and talked to Officer Robert Lamunyon. She told him what happened and named Williams as the shooter. She was then taken to the hospital to have her head examined.[6]

Finally, Heard testified that she remembered very little about the day of the shooting.[7] She asserted that, on the night of the shooting, she did not get out of Robertson's car and did not know who shot her. She acknowledged, however, that some time after the incident, Williams apologized for shooting her, said it was an accident, and explained that he did not know she was in Robertson's car at the time.

For his part, Williams attempted to discredit the State's witnesses, particularly Robertson. During opening statements, the defense implied that Robertson's alleged jealousy of Grant's relationship with Williams motivated Robertson to lie. But there is no evidence to that effect other than Grant's testimony that Robertson's demeanor after the shooting indicated that Robertson was not happy about Williams and Grant being together. The defense also disputed Robertson's and Hemphill's abilities to identify Williams as the shooter because they were both intoxicated at the time. Although Hemphill admitted being "pretty high" and said she and Robertson had both taken Xanax that night, Robertson denied being on drugs. Further, Officer Lamunyon testified that when he talked to

---

[6] Hemphill initially testified that she went to St. Joseph's Medical Center, but the defense pointed out that St. Joseph's has no record of her being there that night. She testified that she was not positive which hospital she went to, and the evidence showed she actually went to Ben Taub Hospital. This is consistent with Hemphill's testimony that the hospital was in a wooded area, which accurately describes Ben Taub but not St. Joseph's. Additionally, Susan Meyers, a counselor from the HPD Family Violence Unit, testified that she called Ben Taub the morning after the shooting in an attempt to find Hemphill and was told she had been released from the emergency room.

[7] Heard was an active runaway and was very uncooperative with the State's attempts to get her into court to testify. Ultimately, she came to court only after being told that she could be arrested if she failed to respond to her subpoena.

Hemphill the night of the shooting, she did not appear to be intoxicated to the level that she could not talk to him about the case. The defense further attempted to discredit Robertson by emphasizing the fact that she waited four months to press charges. But Robertson testified that she was scared of the repercussions of being a "snitch," particularly because Williams stalked her after the shooting. She explained that she called 911 the night of the shooting only because of Heard's gunshot wound. Additionally, a number of police officers from the Family Violence Unit of the Houston Police Department testified that it is not uncommon for victims to hesitate before pressing charges against loved ones.

Grant testified on Williams's behalf and alleged he could not have been the shooter because he was with her. She testified that, in June of 2006, she and Williams had a general routine that they followed every day. Grant testified that because they worked all night, they usually slept all day. When they woke up, they ate dinner and went to a club called Reminisce. At 1:45 a.m., they went to an after-hours club called M&Gs, which Grant co-owned, and stayed there for the rest of the night. On cross-examination, Grant testified that she did not know when the shooting occurred. She also testified that she worked as a bartender at the club, which was usually busy and crowded, and could not always see Williams while she was working. At no point did Grant specifically testify about Williams's whereabouts on June 29, 2006.

In sum, considering the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of aggravated assault beyond a reasonable doubt. *See Merritt*, 368 S.W.3d at 525. Therefore, we overrule Williams's second issue.

IV

In his third issue, Williams argues the trial court erred by denying his motion

for mistrial after Robertson testified about inadmissible extraneous offenses during the punishment hearing.

## A

During direct examination at the punishment hearing, Robertson testified that Williams stalked her after the shooting and that he pulled a gun on her a second time, which led her to make another police report. The examination continued as follows:

> [STATE]: At that point, after you made that police report that he pulled a gun on you again, was there another time before he was caught that you saw him?
>
> A: Yes.
>
> Q: Tell us about that time.
>
> A: This particular time I think—he used to call me all the time and—
>
> Q: Was he still calling you?
>
> A: Yes.
>
> Q: And what—tell us what he would tell you.
>
> A: He used to actually tell me about how he murdered people, like how he burned up—
>
> Q: Don't go into any of that.
>
> THE COURT: Let me excuse the jury for just a minute.

The jury left the courtroom, and the defense asked the trial judge to instruct the jury to disregard Robertson's response. The prosecutor explained that she believed Robertson's testimony concerned an extraneous murder that Robertson mentioned before trial but that the State could not prove. Therefore, the State had no intention of introducing that offense and Robertson was told not to discuss it, which is why the defense received no notice of it. The State expected Robertson's response to be that Williams was calling her and threatening her. The defense objected to Robertson's testimony as nonresponsive, but the court noted that her answer was

14

responsive to the prosecutor's question, even though it was not the answer the prosecutor expected. The defense then moved for a mistrial as to the punishment phase, arguing there was no way to instruct the jury to sufficiently remove the prejudice of that statement from their minds. The trial judge reserved her ruling on that motion. She then brought the jury back into the courtroom and instructed them as follows: "Ladies and gentlemen, the jury is instructed to disregard the last answer of this witness. You are not to consider it for any purpose whatsoever." The defense renewed its motion for mistrial. The trial judge reserved her ruling and excused the jury for the day. Ultimately, after hearing all the punishment evidence, the judge denied the motion.

B

We review the trial court's denial of a motion for mistrial for clear abuse of discretion. *Rojas v. State*, 986 S.W.2d 241, 250–51 (Tex. Crim. App. 1998); *Jackson v. State*, 287 S.W.3d 346, 353 (Tex. App.—Houston [14th Dist.] 2009, no pet.). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *Jackson*, 287 S.W.3d at 353.

A mistrial is appropriate only when highly prejudicial and incurable errors make the expenditure of further time and expense wasteful and futile. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). In determining whether a prejudicial event was so harmful as to warrant a mistrial, we consider three factors: (1) the severity of the misconduct, or the prejudicial effect; (2) curative measures, and (3) the certainty that the jury would have assessed the same punishment absent the misconduct. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). It is well-settled that a prompt instruction to disregard will cure error associated with an improper

15

question and answer, including testimony that refers to or implies an extraneous offense, unless it appears the reference was clearly calculated to inflame the minds of the jurors or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Jackson*, 287 S.W.3d at 354. Because we presume curative instructions are effective, only extreme trial conditions warrant a mistrial. *Sanders v. State*, 25 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd). The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of each case. *Ladd*, 3 S.W.3d at 567.

1

We first consider the severity of the misconduct, or the magnitude of the prejudicial effect of Robertson's remarks. During the bench conference, the prosecutor explained that before trial, Robertson told her about another extraneous murder that the prosecutor could not prove beyond a reasonable doubt and had therefore instructed Robertson not to discuss at trial. To the extent Robertson's testimony referred to that extraneous murder, it was improper. *See* Tex. Code Crim. Proc. art. 37.07, § 3(a)(1). But Robertson also referred to an extraneous burning offense, and the State's subsequent introduction of this evidence (which was not error, as discussed below) properly explained what Robertson was referring to. Because the jury was not privy to the discussions during the bench conference, they may not have realized Robertson's testimony also referred to an extraneous murder not involving burning. Therefore, although Robertson's testimony was prejudicial to some extent, the prejudicial effect was at least partially mitigated by the State's evidence explaining the burning offense.

16

We next consider the curative measures the trial court took. The trial judge instructed the jurors to disregard Robertson's answer and not to consider it for any purpose whatsoever. This conveyed the appropriate message that Robertson's statement was not supported by the evidence and was not to be considered. *See Rojas*, 986 S.W.2d at 250. At the defense's request, the judge did not repeat Robertson's statement as part of the instruction, despite the fact that the bench conference was approximately twenty-minutes long.

For his part, Williams argues, "[t]he trial judge's error was in not granting a curative instruction immediately. . . ." We first note that defense counsel did not immediately request the instruction; he waited until after the jury left the courtroom, and the judge gave the instruction as soon as the jury returned. Further, an instruction need not be immediate to be prompt. *See Montgomery v. State*, 198 S.W.3d 67, 81–82 (Tex. App.—Fort Worth 2006, pet. ref'd) (concluding that when a witness gave inadmissible testimony and the defense immediately requested a bench conference, which took place outside the jury's presence, the error was cured by an instruction given after the bench conference); *see also Escudero v. State*, No. 05-09-01199-CR, 2010 WL 4840501, at *2 (Tex. App.—Dallas Nov. 30, 2010, no pet.) (mem. op., not designated for publication) (considering a witness's inadmissible, prejudicial testimony that was followed by a bench trial during which the defense requested a curative instruction, but which the court did not give until the following morning; the appellate court concluded the instruction was sufficient to cure the error); *Ramirez v. State*, No. 14-07-00464-CR, 2008 WL 4472936, at *2 (Tex. App.—Houston [14th Dist.] Oct. 7, 2008, no pet.) (mem. op., not designated for publication) (concluding that a witness's improper testimony was cured by an instruction given to the jury following a bench conference).

Therefore, we do not find Williams's argument persuasive.

In addition to the trial judge's instruction, the other circumstances surrounding Robertson's answer had a curative effect. Specifically, the prosecutor interrupted Robertson, her own witness, to prevent her from completing her answer, and the judge immediately ordered a bench conference outside the jury's presence. When the jury was brought back into the courtroom, the judge issued her curative instruction, and the defense moved for a mistrial. Accordingly, the actions of the prosecutor, the defense attorney, and the trial judge conveyed to the jury that Robertson's statement was unsupported and inadmissible.

Finally, the jury charge also served to cure the error because the judge properly instructed the jurors not to consider extraneous acts or offenses unless they believed the State proved those acts or offenses beyond a reasonable doubt. The evidence does not rebut the legal presumption that instructions to disregard and other cautionary instructions will be duly obeyed by the jury. *See Archie*, 340 S.W.3d at 741. In light of these circumstances, the jury likely understood that Robertson had misspoken and that her comments were not to be considered in assessing Williams's punishment.

3

We must also consider the certainty that the jury would have assessed the same punishment absent the misconduct. In this case, Williams was convicted of aggravated assault, and because of a prior felony conviction, the applicable range of punishment was 5 years to life in prison and a $10,000 fine. The jury assessed his punishment at 70 years' imprisonment and a $10,000 fine. It is relevant that Williams used a deadly weapon—a pistol—to commit the charged offense. Additionally, the State introduced extensive evidence of Williams's criminal history and prior bad acts to support the lengthy sentence.

18

The jury heard evidence of Williams's propensity for violence, specifically against women. Additionally, two female witnesses testified that while they were teenagers and Williams was in his thirties, they not only had sexual intercourse with him but also prostituted themselves to a number of different men on a nightly basis at Williams's request. A number of witnesses consistently testified that Williams was the leader of the Bloods, which was corroborated by a gang expert's testimony that Williams's tattoos indicated his affiliation to the 59 Bounty Hunter Bloods—the second-largest criminal street gang in the greater-Houston area—and specifically indicated that he was the five-star general, or the leader, of the gang.

Additionally, it is undisputed that Williams had prior convictions for delivery of a controlled substance (cocaine) which is a felony; carrying a weapon, which was reduced from a third-degree felony; and injury to a child. The evidence also showed that while incarcerated, Williams was kept on a high-risk floor and received three major sanctions for fighting with other inmates, as well as three minor sanctions for disruptive and disobedient behavior.

The State also introduced evidence that Williams was a party to the capital murder of Alex Mitchell. Specifically, the evidence showed that five young men—Dewayne Champion, Dre Randall, Rasiya Thompson, Deandre "House" Humphreys, and Anthony Somerfield—lured Mitchell to an abandoned house and severely beat him after Humphreys's girlfriend, Olivia Ford, claimed Mitchell raped her. After the assault, Mitchell was put in the trunk of his car, which Thompson and Humphreys drove around for several hours. The jury watched a videotape of Williams's interview with two police officers, in which he said that he knew some of those young men from a trailer park and they were affiliated with the Bloods.[8] He said he knew Humphreys but had never met Thompson before that

_____

[8] Specifically, Williams said some of the kids from the trailer park were Piru and some

19

night. He also said Humphreys called him "OB," which stands for "older Blood" or "older Blood brother."

Williams explained that on the evening of Mitchell's murder, Thompson and Humphreys drove to his house and told him what they did to Mitchell. They said Mitchell was still alive in the trunk and asked Williams for a pistol they could use to kill him. In the video, Williams claimed that he told Thompson and Humphreys not to kill Mitchell, explaining that if they did, they would also have to kill Ford because she knew about the attack and may tell the police. Williams explained that, because he knew Humphreys was not going to kill his girlfriend, they should not kill Mitchell either. Although Williams initially denied that he gave anything to Thompson and Humphreys, he ultimately admitted that he gave them a gas can and told them to burn the car to destroy evidence of their involvement. Williams also admitted that he gave them $5 for gas. Nevertheless, he maintained that he advised them to drop Mitchell off at a local fire station and not to kill him. Williams acknowledged that he knew Thompson and Humphreys planned to kill Mitchell when they left his house, but he denied telling them to burn Mitchell's body as part of destroying the evidence. Ultimately, the evidence showed that someone drove Mitchell's car to a field, poured gasoline around the inside of the vehicle, and lit it on fire while Mitchell was alive in the trunk. His autopsy showed that his cause of death was smoke inhalation.

4

Balancing those factors, we conclude that the trial court did not abuse its discretion by denying Williams's motion for mistrial. Although the misconduct may have had some prejudicial effect, it was not so egregious that it was

---

were Bounty Hunter, but he explained, "Don't get me wrong, they all Bloods." Piru, like Bounty Hunter, is a set (or subsidiary gang) of the Bloods.

impossible to remove the harmful impression from the jurors' minds. The trial judge gave a prompt curative instruction that, along with the other circumstances surrounding Robertson's comment, conveyed the appropriate message to the jury. And it is highly likely that the jury would have assessed the same punishment absent the misconduct, given Williams's use of a deadly weapon in the present offense along with his string of prior convictions, his reputation for violence and gang affiliation.

V

In his fourth and final issue, Williams argues the trial court erred by overruling his objection to the evidence of the extraneous capital murder during the punishment phase. In response, the State argues Williams failed to preserve this error for appeal and, alternatively, the extraneous offense was admissible.

A

The rules for preservation of error are discussed above. We further note that the objection must be sufficiently specific to apprise the trial judge of what the objecting party wants, why the objecting party thinks himself entitled to relief, and the objection and request are clear enough for the judge to understand at a time when the trial court is in a position to do something about it. *Lankston v. State*, 827 S.W.2d 907, 908–09 (Tex. Crim. App. 1992). Nevertheless, the court of criminal appeals has warned the courts of appeals not to "split hairs" when confronted with a waiver question. *Lankston*, 827 S.W.2d at 909; *Mosley v. State*, 931 S.W.2d 670, 674 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). "We are to reach the merits of a complaint 'without requiring that the parties read some special script to make their wishes known.'" *Mosley*, 931 S.W.2d at 674 (quoting *Lankston*, 827 S.W.2d at 909).

21

Before Williams's punishment hearing began, the defense objected to any evidence of the events that occurred prior to Thompson and Humphreys going to Williams's house on the night of Mitchell's murder. The defense stated that, because the State could not suggest or imply Williams was involved in the planning of the attack or in the attack itself, those facts were irrelevant and the prejudice "totally outweighs" any probative value. The judge asked what the significance of Williams giving them a gas can would be if the State could not introduce those facts. The defense responded that the State could not "really truly tie that that gas can was even connected to that car because they don't have— they're not bringing anybody to testify who was there at the scene," and further asserted that Thompson and Humphreys decided to kill Mitchell before going to Williams's house. The judge reminded the defense that the jury could not consider the offense unless they believed it beyond a reasonable doubt and further noted that if Williams was, in fact, a party to the offense, it is irrelevant when the decision to kill Mitchell was made. The trial court then overruled the objection.

Before the second day of the punishment hearing began, the defense raised this objection again. Although the defense initially seemed to argue the State could not prove the offense beyond a reasonable doubt, he summed up the objection by explaining, "I'm objecting to all of the testimony, all of the events that leads [sic] up to Thomas [sic] and Humphreys coming to Mr. Williams' house because I don't see what the relevance is. Prejudice is just overwhelming." The judge overruled this objection.[9] The defense then obtained a running objection to all of the testimony regarding the objected-to events.

_____

[9] The defense specifically objected to any evidence that Champion and Randall were smoking marijuana and PCP on the morning of Mitchell's homicide. The State agreed not to introduce those facts, and the trial court sustained the defense's objection as to that evidence only.

On appeal, Williams argues the trial court erred by allowing the State to introduce any evidence of the capital murder. But the defense's objection at trial was not so broad. And although we do not require the objecting party to read any special script to make his wishes known, the objection must be sufficiently specific to apprise the trial judge of what the objecting party wants. *See Lankston*, 827 S.W.2d at 909. On this record, the defense clearly apprised the trial judge of the objection to evidence of the events that took place before Williams became involved in the crime, but not to the entire offense. Although the defense had a running objection, it was only "for the previous reasons stated" and was thus no broader than his initial objections.

B

To the extent we can interpret Williams's complaint on appeal to comport with the objections made at trial, we find no error in the court's ruling. Under the law of parties, a "person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code § 7.01(a). A person is "criminally responsible" for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2). Because a reasonable jury could have concluded beyond a reasonable doubt that Williams is criminally responsible for the offense committed by the conduct of Thompson and Humphreys, the pre-involvement evidence was properly admitted.[10]

---

[10] "'[A]dmissibility of evidence at the punishment phase of a non-capital felony offense is a function of policy rather than relevancy.' . . . Determining what is relevant then should be a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999)

We conclude the trial court did not abuse its discretion by allowing the State to introduce the underlying facts of the extraneous capital murder, and we therefore overrule Williams's fourth issue.

* * *

For the foregoing reasons, we affirm the judgment of the trial court.


/s/    Jeffrey V. Brown
       Justice


Panel consists of Chief Justice Hedges and Justices Brown and Busby.

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

(quoting *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990)).